Would you be more comfortable sitting down arguing? Your Honor, I'm happy to stand up. Thank you. Okay. Jeffrey McCoy on behalf of Appellants Payman Pakdel and Seema Chagina. May it please the Court. Your Honors, the District Court prematurely dismissed the Pakdel's constitutional challenge to lifetime lease requirement. All of the Pakdel's claims require the District Court to engage in some sort of factual analysis in order to reach its judgment. Therefore, we ask this Court to vacate and remand to the District Court. I will first address the taggings claims, and then the unreasonable seizure, and then finally the due process and equal protection claims. First, for the taggings claims. The District Court dismissed the taggings claims for one reason, and that was because Pakdel's failed to follow the state remedies requirement of Williamson County. This summer in Nick, the Supreme Court overturned that requirement, and therefore, there is no need to seek state remedies for compensation. Nick said that it wasn't disturbing the other Williamson County requirement, though, which is that you seek a variance or exception from what is being challenged as a tagging. Did you do that in this case? Correct, Your Honor. The Nick did not disturb the finality rightness requirement. But as the Court said in Williamson County itself, that rightness requirement is not an exhaustion requirement. And as the Court reaffirmed in Nick, exhaustion of administrative remedies is not a prerequisite to bringing in 1983. But there is this requirement to seek a variance or the equivalent. And did you do that in this case? Well, Your Honor, they did request to be accepted from the lifetime lease requirement. They were told no. When did they do that? Your Honor, that was initially with the decision, initially. And if you look, it's in the introductory paragraphs of the complaint. And as we are in a motion case. But was that request made only after they had promised to give the lifetime lease and gotten the change of ownership or of property status? No. It was before they submitted it. They were told no. This was during the process of it, Your Honor. So I think I wasn't aware of any time that they requested an exception before they said that they were following the program. Can you point me in the record to where they did that? Well, Your Honor, it is in the complaint, in the introductory paragraphs, that they sought a variance from it. And also there is a ---- Okay. What paragraph in the complaint? Your Honor, I don't have that off the top of my head. I can get that for you if you would like. Well, it seems like it might be an important point, because I think it's a requirement that remains after Nick. Your Honor, all that requires is a final decision. If you ---- In Williamson County, Williamson County is no different from the normal ripeness requirement. And that's made clear in the first part, is there a final decision. And in this case, we do have a final decision from the city. Furthermore, Your Honor ---- Well, I mean, Williamson County had a whole discussion about the need to seek a variance before you get a final decision as a separate requirement from the state litigation requirement. Well, and furthermore, Your Honor, not ---- like I said, they did. But furthermore, as the statute says, and as the Pachtels were told, this was a mandatory requirement. So there was no possibility of the city being able to grant a variance to this requirement. It was required by the ordinance as well. So ---- So you're arguing that the ripeness requirement would be futile. There's no way to seek a variance? Is that your position? That's one of the positions, Your Honor. They did request, and they were told that they would not be excluded. But also, yes, the statute, and this is in the supplemental briefing in footnote 2, I believe, that points out the ---- where in the ordinance the ---- makes it mandatory for this. So, yes, both in terms of ---- So it seems to me that your clients could have argued that this may be a general program, but we are just single owners. We're not landlords of many properties. We want to live in this house. Could you please give us an exception for when we are ready to move into this house that we can move in? Did they ever say something like that to the city? They requested to be exempted from it. And did they give reasons? Well, yes, they did in terms of explain their situation. So how do we tell that from the record? Can you ---- again, it would be helpful if you could point us to that. All right. Well, I'm happy to do that. I'm sorry about the crutches, though, so. Mr. McCoy, it used to be, I don't know if it still exists at the time of this litigation, it used to be that the city and county of San Francisco had an administrative three-person unit that reviewed applications for variances. Did that exist at your time? At which time? When they submitted the conversion application? Right. There was a different ---- the ordinance did change the methodology. There was still an appeal to the administrator that was available after the final decision. But after the administrator, wasn't there a three-person panel that used to meet in City Hall? There may have been, Your Honor, but ultimately that does not matter because exhaustion of administrative remedies is not in terms of because it was mandatory, the exhaustion of administrative remedies, they were not the pactos were not required to exhaust administrative remedies. It seemed to me that there was always an appeal to this administrative body even in mandatory situations. But you're telling me there wasn't? Well, Your Honor, whether or not it's ultimately the pactos were not required to exhaust in terms of it's all that Williamson County's ripeness requirement requires is a final decision that has had an injury, that has resulted in an injury to the plaintiffs. Okay. Your Honor. So, yes, Your Honor. On paragraph 24, and this was after they had submitted, after they had submitted the initial part of the conversion application, which they were legally obligated to do under their agreement with other tenants in common, they said that they did request them to, that they be excused from it. And then the further paragraph said that they were, that the city denied that. And again, as I said, it wasn't mandatory. So in that case, again. But they had already at that point, so in May they had executed the lifetime lease. So you're saying somehow after they had done all the things that this program was about, they then asked for an exception? But they had not recorded it yet, because there was a time limit after the submittal. Basically, it was here's the application, here's the form that we're going to. But it was not recorded. But my understanding is that there's a hearing that happens, a public hearing that they didn't go to the public hearing and object, did they? No, Your Honor. And then there's some kind of 10 days when you can file a written appeal. They didn't do that either, right? Right. But the written appeal is an appeal of a final decision. And, Your Honor, again, going back to, as it is in footnote 2 in our supplemental reply brief, that points out that that is, the way that the ordinance says is that you can appeal a final decision by the city, and that would be the final decision in that case. And, again, with the ripeness requirement, the ripeness requirement is no different than any other ripeness requirement, the ripeness requirement in Williamson County. All it is is there's a final decision. And, Your Honor, ripeness is looking forward, exhaustion is looking backwards. And so the city is arguing here, well, the Pactels should have done something, they should have done something. If there is an opportunity in the future, if the city admits that the Pactels can go and request a variance, then, yes, it would not be right. But the city has not suggested that. And that's what ripeness is about. Is there something? Well, do you think there's an opportunity if we remanded that you could seek now? No, Your Honor. Under my reading of the statutes, the decision becomes final after a certain number of days. And so they cannot seek. And that's all about what ripeness is about. And it's no different in Williamson County than it is with any other ripeness, Your Honor. Can the Pactels seek some relief further to ripen their claims? And the city has not suggested that. They're only backwards thinking they should have exhausted, they should have done this. Well, that could be. If there was an opportunity to seek a variance that you didn't pursue and you're now too late, that would be a bar to your claim, wouldn't it? Your Honor, it would not be a bar. That would be an exhaustion claim, Your Honor, because if there's something that they did not do, again, it's a bar. But, I mean, there is allowed to be a statute of limitations. I mean, for the State litigation prong of Williamson County, when it used to be that you had to do your State challenges, if you missed the statute of limitations under State law and were too late, that just barred your Federal claim, right? So why wouldn't the same thing be true about seeking a variance if there's a time requirement? Because, Your Honor, ripeness is different. Like I said, ripeness is forward thinking. Is there a final decision here for the court to review? Is there an injury, a concrete injury suffered by the plaintiffs? And that is true here. There is a final decision. The city has decided and made it clear that they are going to enforce this lifetime lease requirement. And, therefore, there is nothing that the Pataglios can do to ripen their claim in that case. And, Your Honor, because neither prong of Williamson County applies, the city below only argued Williamson County on the dismissal for the Takings claims. It is appropriate for this Court to vacate and remand. It's appropriate to vacate and remand because Takings claims are, by their very nature, factual in nature, and there's not enough in the record for this Court to decide. It's appropriate for the district court to do the fact-finding necessary to resolve the Takings claims. I do just want to briefly address the 28J letter that the city submitted yesterday about the city's claim. You think there was a property right to convert this property to a condominium and kick out the tenant? I mean, did you have a right to definitely do the thing that you want to do? Well, there's clearly a property right, Your Honor, to exit the rental market. There's a statutory right. There's also the right to exclude and to use and enjoy your property, which are. Okay. But was there any right that you had or that your clients had to convert this property to a condominium? Your Honor, the city made that right, but also I would. Well, they made that right, but contingent on this agreeing to a requirement about the tenant. Well, as the Supreme Court said in Dolan, Your Honor, the government cannot condition a benefit on the taking of private property. And so in this case, and there is a Nolan Dolan claim in this case, is that this is an unconstitutional condition. And so furthermore, Your Honor, if you look at Horn and Loretto, there are the whether or not something is voluntary is both a question of fact, but it also goes to it that there's not the government can't just put, the government does have limits and the government does have to follow the Fifth Amendment and Takings Clause when it provides conditions for this. Your Honor, I would also briefly like to point, address the Cedar Point case that the city submitted yesterday. Cedar Point, this Court, it's very distinguishable. This Court in Cedar Point focused on the limited nature of the intrusion in that case. It was limited to a couple hours a couple times a year. This Court noted in Cedar Point that the plaintiffs in Cedar Point did not allege that they could not use their property. The plaintiffs in Cedar Point did not allege that there was any substantial decrease in the value of their property. Both are true here. The Pactell's have alleged a substantial decrease. They've alleged that they are no longer to use their property. And so Cedar Point is distinguishable on the Takings claims. Again, also, there was no penitential claim in Cedar Point, but it's also distinguishable for the Pactell's Fourth Amendment claims. Again, on the Fourth Amendment part of the Cedar Point opinion, this Court noted that the Cedar Point plaintiffs did not allege that they could not use their property. Pactell's have alleged that here. Thank you very much. Your Honor, I would like to reserve the remainder of my time. Thank you. Good morning, Your Honors. May it please the Court. I'm Deputy City Attorney Kristen Jensen on behalf of the City and County of San Francisco. And pursuant to the Court's instruction, I'm going to start with the Nick v. Township of Scott issue as well. As we know, under Nick, the Court has only eliminated the second prong of the Williamson ripeness county. And as the Court has already pointed out, it preserved explicitly the first prong of the ripeness test that was set forth under Williamson County. So what we know under Nick is that a property owner such as the Pactell's must still ripen their claim. Now, I found it interesting to hear Appellant's counsel argue on the basis entirely of a factual misstatement. The record does not suggest that they ever asked the City for relief from the lifetime lease requirement until after they had obtained the condo conversion map. In fact, the complaint at paragraph 24 and the district court's order both state that they first requested relief from the City in June of 2017 after they had received the condo conversion map. So this was long after the appeal period under the subdivision code had passed. They never submitted an application for condo conversion which requested a waiver as permitted under the condo conv the expedited program itself, nor. So is there some waiver exception that they could have gotten? There is both a provision under the ECP, the expedited conversion program, that is specific to that program which allows open-ended waivers. It doesn't suggest exactly what it's limited to. There's language about waivers or adjustments to the fees. But we also have a much broader provision under the subdivision code. So I thought that the section 3.3 said that the developer covenants and agrees that it will not seek a waiver. The agreement itself does say that. But we also have a section of the subdivision code, section 1312 of the subdivision code, which provides very broadly for the department to grant waivers for subdivision applications. Now, these petitioners were represented by counsel when they applied for their subdivision map. These were not, you know, unsophisticated individuals applying by themselves. So they should have, at one of multiple points during this process, notified the City that they had a problem with this requirement. They could have done it at the time of application. They could have done it during the planning commission hearing that counsel pointed out earlier. They could have done it at the time the tentative map was issued. And when that map was issued, they received a notice saying if you object to the map or any terms of condition, you have X number of days and here is the procedure by which you appeal to the board of supervisors. They did not do so. So let me be clear. Has anyone ever gotten a waiver from the lifetime lease requirement? Nobody has ever asked for one, Your Honor. And let me be very clear. We are not conflating exhaustion and ripeness here. There are a number of cases, both in this circuit and elsewhere, that explain that in the takings context particularly, there is a great deal of overlap between these two doctrines of ripeness and exhaustion. We're not suggesting that they are the same thing. What we're saying is until a property owner has exhausted any variance, and one of the cases I think it's Palazzolo says the term variance is not talismanic, so that means any exception you could get to the rules in place. Until you have exhausted the ability to seek any available variances or exceptions, you have not ripened your claim. Now, again, I'd like to address what I think is another misunderstanding of counsels, and that is a misunderstanding of the ripeness doctrine itself. It is not exclusively forward-looking. If a property owner attempts to end-run these kind of variance or exception procedures that are made available, reasonable procedures made available at the administrative level, they do not get to manufacture a futility argument at the other end of the process. So you don't get to take all of the benefits of a land-use approval process, as they have done here, wait until the very end of that process, and then argue it would be futile for the court to send them back and seek those variances because the time period has passed. Again ---- So that's logical and seems persuasive, but is there a case that tells us that? Yes, there is. There is one case that I have that literally one of my colleagues found, I believe, last night. So I have not provided a citation, but can. It's the reason he found it last night is that it's one of the very recent cases that has cited Nick. It is Chabad-Lubovitch of the Quad Cities, Inc., versus the city of Bettendorf, Iowa. And I can provide it to the court with a letter following today's argument, if you'd like. And basically one of the last lines of the case says, because they refused to seek one, that is a variance, they cannot now end-run the process in federal court. One of the cases we did cite, which says something similar, is the Guate, G-U-A-T-A-Y case, which similarly says you don't get to seek or you don't get to argue futility if you've never exhausted the potential variances or other exceptions that were available during the administrative process. Again, it's both logical and reflected in the cases. There are probably other cases that hold similarly, but those are the two that I can cite off the top of my head. Is it your position that they had an opportunity to seek an exception, but now that opportunity is passed? Yes. So you don't think there's any ability now to ask for an exception if we remand it or something like that? No. If the Court is interested, I'm happy to talk about Cedar Point. But what I would like to say generally is, in a 12b-6 motion, this Court has in the case in Cedar Point, it doesn't matter whether they're attempting to fit their case under the Penn Central rubric, as was the case in the Rancho de Calistoga case that was decided by the Ninth Circuit. In either circumstance, this Court is fully capable on this record of determining that the Petitioners have failed to state a record in this case. Under the Penn Central standard. Failed to state a claim is what you mean, right? Sorry. Failed to state a claim, yes. Could you respond to the unconstitutional condition point that opposing counsel is making at the end of his argument? Why is this not an unconstitutional condition? Well, there's no right to convert to a condo. We know that from California law, which we've cited in the briefs, but to make it easy for the Court, the Griffin Development Company case makes it very clear under State law there is no right to condo conversion. Similarly, I think they are trying to argue now that they have the right to basically evict the tenant at whatever time they like. In fact, the trial judge asked them to explain exactly what the right was that they were seeking to protect, and that's the way counsel at the trial court articulated it, the right to eject their tenant whenever they wanted to. Again, they haven't pointed to a single case that says that is a constitutionally protected right. They entered into a contract with a tenant, and they already, by doing so, entered into a regulated field. San Francisco has both rent control and eviction control protections that apply the moment you enter into a rent agreement with a tenant, as they did here. So there is no right to evict because you want to. Now, what they're saying is they could have done an owner move-in eviction. Maybe. But even under the old lottery program, there were limitations on when and if you could do an owner move-in eviction. Also, they argue that they somehow had rights under the State's Ellis Act to go out of the rental market. They're wrong on two counts. First of all, the Ellis Act does not apply to condominiums. So regardless of whether we're operating under the old lottery system or under ECP, the Ellis Act never would have applied to this. So if they wanted to go out of the rental business, they would have had to done so and used the Ellis Act to do so. They would have had to do so before they converted to condominiums. And they would have had to get all of their co-owners to join in that effort. You can't Ellis a single unit in a building. You have to Ellis the entire building. So all of the owners would have had to agree that they were never again going to rent any of the units in that building. So that is a spurious argument. So they have not pointed to any right that they've been asked to forego that they hadn't voluntarily given up by entering into private contracts with first their co-owners and then the tenants. They then voluntarily entered into this contract with the city in recognition, as stated in that agreement, of the fact that a condo is worth significantly more than an apartment held in a tenancy in common. They also got another group of goodies, including a fee waiver, or a fee reduction, I should say. And the ECP program itself allows you to ask for additional waivers, like further reduction in those fees. So among other things, whether or not the city would have agreed to allow them off the hook for the lifetime lease requirement, they could have asked for a further reduction in the fees that they had to pay at the time of application. That might have been another way to balance the scales of any alleged diminution   How large are the fees? $20,000 per unit. And it's a six-unit building. And according to the complaint, their tenancy in common agreement requires that the Pachtels evenly share the costs of application with their co-owners. So there are a number of opportunities they would have had either to ask for relief from the lifetime lease requirement or to lessen the expense of that application from the city. More important in a real-world sense, they had a number of opportunities to ask their co-owners for a change in the terms of their contract. If they believed in 2013, when the city adopted this change in the condo conversion program, that it fundamentally altered the assumptions that everyone had when they entered into that tenancy in common agreement, they could have gone back to their co-owners and asked to renegotiate the timing so that they could perhaps have waited until after this temporary program, because the ECP is a temporary program, had expired, and then reapplied to the lottery. Or they could have renegotiated the distribution of costs of application. They could have asked for any number of forms of relief from the private parties who they say have compelled them to apply for conversion through the early conversion program when and how they did. So the ECP was a temporary program, and it actually hasn't been in effect, right, because of this litigation? Exactly. And in fact, that is one point that I would like to make, because although they haven't quite argued it expressly, because I think they know what our response would be, the appellants seem to argue that there would be no harm to send us back to the trial court for further proceedings on this. In fact, there is a great deal of harm. Some of it is to the city, because the city always has an interest in finality when it comes to challenges to the legality of our legislative enactments. But more importantly, there are thousands of like-situated tenancy and common holders who cannot convert their condominiums because the program has been suspended as a result of this litigation. Suspended it. It was suspended as part of the legislative enactment. Decided to suspend it. The city did. It was part of the original. The city can undecide to suspend it? Pardon me? The city can undecide to suspend it? In theory, but because we have to. In theory, in practice. In practice, we could unsuspend it. But we have the suspension because we need a ruling on the legality of the program as a whole. The city made a policy determination that it would only expedite these conversions if we could do so without creating a rush to elimination of rent-controlled apartments on the market. So we would have to make a different calculus if we lose this part of the program. Which can be done. It could be done. By the city. It could be done. The policy decision of the city is holding things up. Not anything that the appellants are requiring. My point, Your Honor, I understand the court's point. But my point is that there is harm to both the city and to other tenancy income holders. I would disagree with that. In fact, I would suggest that it's rather cynical of the property owners to not only wait until after they had the benefits of their bargain to ask for relief, but wait until after they had the benefits of the bargain to file the lawsuit that they knew would suspend the program that they wanted the benefits of. They knew it would suspend the program if the city kept the suspension in effect. I'm sorry. I didn't hear the first half. They knew that it would suspend the program if the city would keep the suspension in effect. Yes, Your Honor. If the city can revoke the suspension in five minutes. The city could, but there's no need for the city to, because we don't believe that it's an unconstitutional condition. That's what this lawsuit's all about. Yes, it is, Your Honor. Okay. I didn't have any other comments unless the court had questions, so the city's prepared to submit. Thank you, Your Honor. Thank you, Your Honor. May it please the Court. First to note that the city only filed a 12b-1 motion below in terms for the takings claims. They did file a 12b-6 for the remaining claims. So in this case, we are not up on a motion to dismiss for failure to state a claim   The city mentions that this was some benefit and that the Pactels could have gone to their co-tenants and negotiated. Those are all factual questions, Your Honor. The Pactels have alleged they did not receive a benefit. In fact, that it would significantly reduce the value of their property. That's a factual question. What they could have done with their co-tenants. Wait a second. You're saying that conversion to condos was not a financial benefit? Your Honor, subject to the lifetime lease. And even the report that San Francisco said that said condos would be a financial benefit did not take into account whether or not there was a lifetime lease. So why didn't they go to their co-tenants in common and say let's not do this, this is a bad idea now? Your Honor, again, that's a factual question on whether or not they did. But also, they were and felt that they were legally obligated, Your Honor. But that's a private agreement. So, I mean, if your whole case turns on a private agreement they had with their co-tenants, that's not unconstitutional, right, because that's not the government. Well, it goes to whether or not it was a voluntary agreement. Well, they had a voluntary agreement with their co-tenants, didn't they? But whether it was voluntary to subject themselves. I see that I'm out of time. May I answer the question? It goes to whether or not it was voluntary in terms of their decision to apply for the condominium conversion, Your Honor. Ultimately, Your Honor, this case is fundamentally different than the, and I would argue in every case that is about rent control ordinances. The courts have always mentioned that it was one factor in their decision was whether or not they could exit the rental market. This was emphasized by the Supreme Court in Yee v. Escondido, that they could, that the reason why it was constitutional there is because they could exit the rental market. Here, there is no ability for the pactels, and that was what makes this different.  Thank you very much. Thank you. The case of Pactel v. City and County of San Francisco is submitted for decision.
judges: Gould, Bea, Friedland